UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DENISE H. REIN, Individually and as
Executrix of the Estate of MARK ALLEN
REIN, Deceased, et al.,

                    Plaintiffs,

              -against-

THE SOCIALIST PEOPLE'S LIBYAN ARAB
JAMAHIRIYA, LIBYAN EXTERNAL
SECURITY ORGANIZATION, a/k/a JSO, a/k/a
JAMAHIRIYA SECURITY ORGANIZATION,
LIBYAN ARAB AIRLINES, LAMEN KHALIFA
FHIMA, a/k/a MR. LAMIN, a/k/a A AL AMIN
KHALIFA FHIMA, ABDEL BASET ALI
AL-MEGRAHI, a/k/a ABDEL BASET ALI
MOHMED, a/k/a ABDEL BASET ALI MOHMED
AL MEGRAHI, a/k/a MR. BASET,

                    Defendants.
-----------------------------------------------------------------X

CV-96-2077 (TCP)
MDL 799
CV-03-1579
CV-94-5557
CV-97-4079

MEMORANDUM
AND
ORDER

PLATT, District Judge

        Before the Court are two motions concerning a contingency fee dispute between Sonnenschein Nath & Rosenthal ("SNR") and Constantine Cannon ("CC"):

1. SNR moves to retain the full contingency fee of $1.6 million it claims to have earned on behalf of Rose Copeland;

2. CC moves to retain the full contingency fee, or in the alternative, for 20% of Rose Copeland's total recovery.

For the following reasons, SNR's motion is GRANTED; CC's motion is DENIED.

## BACKGROUND

As the facts concerning this long-running multi-district litigation have been adequately recorded in the prior decision of this Court, see, e.g., Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 325 (E.D.N.Y.), aff'd, 162 F. 3d 748 (2d Cir. 1998), the facts discussed herein are limited to those relevant to the instant motions.

As part of this litigation against Libya, Rose Mary Copeland ("Mrs. Copeland") asserted a claim on behalf of her daughter, Dedera Lynn Woods, her son-in-law, Joe Nathan Woods, Sr. ("Joe Sr."), and their minor children, Chelsea Woods ("Chelsea") and Joe Nathan Woods, Jr. ("Joe Jr."), all of whom were killed in the bombing of Pan Am Flight 103 over Lockerbie, Scotland. (SNR Mem. Supp. and Opp. ("SNR Mem.") at 4).

In December of 1997, Mrs. Copeland and her daughter, Patricia Jones, (collectively, the "Copeland family") retained Douglas Rosenthal ("Rosenthal") of SNR on a contingency basis to pursue their claims against Libya. (CC Mem. Supp. ("CC Mem.") at 4). Mrs. Copeland's claim was asserted in her individual capacity and as representative of the estates of her grandchildren. (R. Copeland Decl. ¶ 2, Ex. A; T. Copeland Decl. ¶ 5). This 1997 retainer agreement stated that SNR would undertake "to represent you personally and in your capacity as personal representative of the estate in connection with litigation against the government of Libya and other defendants for compensatory

or punitive damages as a result of the destruction of Pan Am Flight 103 (referred to herein as 'the Action')." (R. Copeland Decl., Ex. A). The agreement also covered representation in "any and all proceedings ancillary to the Action, including appeals." (R. Copeland Decl., Ex. A). A 2001 retainer agreement between Patricia Jones and SNR explained that "ancillary proceedings" included "efforts to obtain monies from third parties, including the United States government, based on your status as a victim family member." (R. Copeland Decl., Ex. B.; Rosenthal Decl. ¶ 13). Pursuant to these retainer agreements, the Copeland family was obligated to pay SNR "20% of all amounts recovered by you in or as a result of the Action." (R. Copeland Decl., Exs. A, B).

From the fall of 2002 to the fall of 2003, Libya reached a settlement agreement with 269 of the 270 claimants, including Mrs. Copeland. (CC Mem. at 5). The settlement agreement included payments of up to $10 million per decedent. (CC Mem. at 5). To date, a total of $16 million has been released from escrow as proceeds for the wrongful deaths of Joe Jr. and Chelsea Woods, the grandchildren of Mrs. Copeland. (CC Mem. at 6).

Mrs. Copeland was appointed by a New Jersey probate court as administrator of the estates of Chelsea and Joe Jr. (CC Mem. at 6, 7). The Woods family, i.e. the family of Mrs. Copeland's son-in-law and her grandchildren's father, had also sought to administer the estates of Chelsea and Joe Jr., but they were unsuccessful. (Rosenthal Decl. ¶ 15). In the fall of 2003,

however, Mrs. Copeland and the Woods family agreed to share equally in the recovery from Libya. (T. Copeland Decl. ¶ 12; Rosenthal Decl. ¶ 15). As part of that agreement, the 20% attorneys' fee or $3.2 million, was also to be divided equally between SNR and Kreindler & Kreindler, as counsel for the Woods family. (Potter Aff. ¶ 3).

After the New Jersey probate court approved this arrangement, an alleged illegitimate child of Joe Sr. came forward and asserted a claim to the proceeds of the settlement. (T. Copeland Decl. ¶ 12; Rosenthal Decl. ¶ 16). In October 2004, the New Jersey probate court approved a further settlement agreement, in which this illegitimate child would also share in the proceeds. (Rosenthal Decl. ¶ 17 and Ex. B). Thereafter, in March 2005, two additional alleged illegitimate children of Joe Sr. came forward and asserted claims. (Rosenthal Decl. ¶ 18). A subsequent settlement agreement was also reached which included these two additional illegitimate children. (Rosenthal Decl. ¶ 18). Pursuant to this final agreement, the proceeds would be distributed as follows:

| | |
|---|---|
| Woods family members: | $ 2.5 million |
| Jansen Bell (1st illegitimate child) | $ 2.8 million |
| Tamicka Martin (2nd illegitimate child) | $ 1.638 million |
| Tehrani Humphrey (3rd illegitimate child) | $ 1.638 million |
| Kreindler & Kreindler | $ 1.6 million |
| Copeland family members: | $ 5.824 million (with $1.6 million reserved for attorneys' fees) |

(Rosenthal Decl., Ex. J). To date, all monies have been disbursed except the $1.6

million reserved for attorneys' fees from the Copeland family members. (CC Mem. at 16).

In connection with the New Jersey probate proceedings, the Copeland family retained the services of outside counsel recommended to them by Rosenthal. (T. Copeland Decl. ¶¶ 9, 10). Mrs. Copeland was advised by SNR and Rosenthal that the scope of SNR's retainer agreement with her did not include representation in the probate proceedings. (Rosenthal Decl. ¶ 23). Rosenthal does not dispute that he advised the Copeland family members that they would need to seek outside counsel for the probate proceedings. (Rosenthal Decl. ¶ 23). Notably, nor could he dispute this fact as it is documented: in the affidavit of another Copeland family member, Timothy Copeland (T. Copeland Decl. ¶¶ 9, 10); in an August 2003 letter drafted by Rosenthal to Mrs. Copeland (Potter Aff. ¶ 11 and Ex. 6 at 6.); and in a release signed by Mrs. Copeland in November 2003. (Potter Aff. ¶ 17 and Ex. 9).

In connection with the probate proceeding, the Copeland family expended approximately $123,900 in attorneys' fees to a New Jersey law firm. (T. Copeland Decl. ¶ 11 and Ex. A). In November 2005, all of the family members named above entered into a binding settlement agreement, (Rosenthal Decl., Ex. J), the terms of which were the same as those agreed to in a June 22, 2005 "letter of understanding" between the parties. (Potter Aff. ¶ 31 and Ex. 19 at 2). This settlement agreement was approved by the New Jersey probate court

on January 17, 2006. (Rosenthal Decl., Ex. J). This agreement provided for the "payment of attorneys fees (20%) and expenses, jointly to Constantine Cannon, P.C., and Kreindler & Kreindler." (Rosenthal Decl., Ex. J).

Rosenthal claims that he assisted the Copeland family in the probate proceedings out of a sense of personal obligation to his clients, (Rosenthal Decl. ¶ 20), and because he felt that SNR's potential recovery was jeopardized by the probate proceedings, in which the Copeland family stood to recover nothing if their interests were not protected. (CC Mem. at 10). Rosenthal now belatedly takes the position in connection with this motion that it is his belief that SNR was obligated to represent the Copeland family in those proceedings, despite his words to the contrary to the Copeland family, explicit directives to him from SNR to "stay out of this estate representation mess," and the Copeland family's acknowledgment that they had to retain local counsel in the probate proceeding. (Rosenthal Decl. ¶ 25 and Ex. E).

Nonetheless, following the settlement with Libya and during the ongoing probate proceedings, on July 31, 2005, Rosenthal retired from SNR and joined CC, effective August 1, 2005. (Rosenthal Decl. ¶ 27). Rosenthal wrote the Copeland family shortly before he retired, and invited them to allow him and CC to continue to represent their interests in connection with the litigation, both against Libya and in the probate court. (Rosenthal Decl., Ex. H). Thereafter, the Copeland family terminated SNR's representation and signed retainer agreements

with CC. (Rosenthal Decl. ¶ 27). The 2005 retainer agreement with CC states: "In no event and under no circumstances will you be obligated to pay legal fees and expenses to Sonnenschein and/or Co-Counsel in excess of 20 percent of the recovery made, and any portion of any fees and expenses determined to be owed Sonnenschein will be made by and from the Contingency Fee paid to C/C." (Rosenthal Decl. ¶ 27 and Ex. I). In a December 16, 2005 letter to Mrs. Copeland, Rosenthal stated " . . . we believe Sonnenschein is entitled to most of the legal fee for the $16 million distribution . . . ." (Rosenthal Decl., Ex. I).

SNR was not notified by CC or anyone else that the probate proceeding had concluded and that the probate court had authorized the distribution of the proceeds of the suit. (SNR Mem. at 8). Instead, SNR only learned of the settlement agreement and distribution when a copy of the agreement was faxed by accident by an attorney at Kreindler & Kreindler to Rosenthal at his former SNR office. (SNR Mem. at 8; Rosenthal Decl. ¶ 37). Upon receipt of this misdirected fax, SNR notified the Plaintiff's Committee of its entitlement to the 20% fee, and this litigation ensued. (Rosenthal Decl., Ex. K). SNR initially refused to agree to disburse the proceeds to the Copeland family until it could determine that only $1.6 million in fees was at stake, as it was unaware of the terms of CC's retainer agreement with the Copeland family. (Begleiter Decl., Ex. C). Eventually, CC stipulated that the maximum amount of fees due from the Copeland family was $1.6 million, (Begleiter Decl., Ex. G), and

SNR agreed to distribute the balance held by the Plaintiff's Committee to the Copeland family. (Begleiter Decl., Ex. K).

## DISCUSSION

SNR argues that it is entitled to the full contingency fee. CC argues that it should be awarded the full contingency fee as a result of SNR's unethical conduct. Alternatively, CC argues that it should be awarded 20% of Mrs. Copeland's recovery.[1]

## I.     Forfeiture of Fee

CC asserts that SNR acted in violation of various ethical codes by refusing to release the proceeds of the Libya litigation to the Copeland family, and thus, it has forfeited its fee. SNR asserts that it acted reasonably in requiring CC to assure it that the amount of fees at issue was limited to the $1.6 million currently in dispute. CC initially refused to produce its retainer agreement with the Copeland family and only agreed to do so when it became clear that the dispute was at a standstill.

CC relies on <u>Louima v. City of New York</u>, 2004 WL 2359943, at *88, 90-91 (E.D.N.Y. Jul. 21, 2004), for the proposition that where an attorney

---

[1] CC also disputes the amount of the contingency fee and argues that SNR's recovery should be limited to amounts recovered by the Copeland family directly and should not include the total recovery obtained from the Libya defendants. The Court believes this argument to be without merit and contrary to the terms of the retainer agreements. Thus, the contingency fee at issue and discussed herein is $1.6 million.

engages in unethical conduct to the harm of its client, the attorney forfeits its right to any fee recovery. This argument is unpersuasive here for a number of reasons. First, CC has not demonstrated how the Copeland family has been harmed. The funds were held in the interest-bearing account of the Plaintiff's Committee until the Court authorized the distribution. The Copeland family was no worse off during the weeks when this dispute was occurring than they were throughout the entire last seventeen years. Second, CC ignores SNR's completely reasonable position of requiring CC to assure SNR that CC had not obligated the Copeland family to pay any more in fees than the 20% contingency fee, which had been negotiated originally. Moreover, as late as December 16, 2005, Rosenthal himself had represented to the Copeland family that it was his belief that Sonnenschein was entitled to the majority of the fee. Under these circumstances, the Court must conclude that SNR has in no way forfeited the fee negotiated under its retainer agreement with the Copeland family. SNR did not act unethically, nor did SNR engage in any conduct which prejudiced the interests of its former client.

**II.     Terms of SNR's retainer agreement**

As noted above, Rosenthal appears to now take the position that he was obligated to protect the interests of the Copeland family in connection with the New Jersey probate proceeding. The source of this obligation, according to Rosenthal, intermittently stems from either a sense of personal obligation to protect the interests of Mrs. Copeland, who buried five family members in one

day, or from the scope of the 1997 and 2001 retainer agreements, which reference "ancillary" proceedings. Rosenthal speculatively argues that the probate proceedings were "ancillary" in that had he not become involved in the probate proceedings, the Copeland family, and consequently the attorneys who represented them, would have recovered nothing.

SNR argues in response that it was made clear to Mrs. Copeland and to Rosenthal that the scope of SNR's representation did not extend to any probate proceedings; and further, the probate proceedings were not "ancillary" to the Action against Libya for the bombing of Pan Am Flight 103. SNR directs the Court to the black letter definition of ancillary and prior decisions of this Court in support of its position. Black's Law Dictionary defines an ancillary proceeding as "one growing out of or auxiliary to another action or suit, or which is subordinate to or in aid of a primary action." SNR argues that the probate actions did not "grow out of" or depend upon the Libya litigation, but rather they arose separately and assert independent causes of action. Also, SNR argues that this Court has previously dismissed suits brought by individual family members of the decedents, recognizing that the settlement agreement with Libya was only with the personal representatives of the estates of the decedents. See, e.g., MacQuarrie v. Libya, 96-CV-2077, Memorandum and Order, April 29, 2004.

SNR's position has merit. Although it makes sense that had no one protected the Copeland family's interests in the probate proceeding that they

may have gained nothing from the litigation, Rosenthal ignores the fact that SNR and Rosenthal informed Mrs. Copeland that she would need to retain separate counsel to protect her interests in the probate proceedings.  Rosenthal, himself, even assisted in arranging the outside counsel.  The Copeland family, in fact, retained outside counsel and expended over $123,000 in attorneys' fees to this outside counsel (although the Court has not been presented with any information on the fee arrangement between the Copelands' and outside counsel).

It appears that Rosenthal on behalf of CC, in executing a new retainer agreement with the Copeland family in 2005, extended the terms of the representation to include the probate proceeding, whereas SNR had made it very clear to the Copeland family that their representation did not include representation in the probate proceeding.  Arguably, Rosenthal acted as this outside counsel as of August 1, 2005, when he joined CC.  In addition, the terms of the settlement of the probate proceeding were agreed to in a June 22, 2005 "letter of understanding" and those exact terms later implemented in the settlement agreement approved by the probate court in January 2006.  Thus, Rosenthal's work in connection with the probate proceeding was essentially complete before he retired from SNR on July 31, 2005.

Moreover, the court is troubled by what appears to be an effort to leave SNR in the dark about the distribution of the proceeds following the settlement of the probate proceeding.  It is unclear to the Court whether Rosenthal

intended at some point to apportion the attorneys' fees between SNR and CC or to retain the entire fee award pending the resolution of the action he filed in the District of Columbia ("D.C.") against SNR a short while after leaving that law firm.[2]  Certainly, retention of the $1.6 million fee award would have given him some leverage in the D.C. action.  Moreover, in spite of this Court's decision herein in SNR's favor, Rosenthal may have a claim as part of his pending suit in D.C., in which he makes a claim for what he asserts is his portion of these exact same attorneys' fees earned pursuant to his SNR partnership agreement.

For these reasons, the Court concludes that the probate proceedings were not "ancillary" and may not be included within the scope of SNR's representation of the Copeland family.  Rosenthal, on behalf of CC, had no right to expand the scope of SNR's representation without entering into a further fee agreement on that basis.  Thus, SNR has earned the entire contingency fee.  Moreover, despite the Court's inquiry during the oral argument on this motion, the Court has been presented with no evidence as to the amount of time expended

---

[2]Neither party has raised, as an alternative point, deferring decision on these motions until the conclusion of Rosenthal's pending suit in D.C.  SNR asserts that Rosenthal's argument that SNR should have devoted more resources to the Copeland family's case is a red herring and is currently being litigated in Rosenthal's suit against SNR.  Thus, SNR urges the Court to decide this dispute without delay.  Rosenthal, on the other hand, barely makes mention of his pending action against SNR, wherein he claims essentially that SNR breached its partnership agreement with him by failing to adequately compensate him for his work in connection with the Libya cases.

by CC or Rosenthal that would warrant an apportionment of that fee between SNR and CC.

## **CONCLUSION**

For the foregoing reasons, SNR's motion is GRANTED, and CC's motion is DENIED. By this Memorandum and Order, the Court hereby awards the $1.6 million contingency fee currently held in escrow to SNR and directs the Plaintiff's Committee to release the same to SNR.

SO ORDERED.

       /s/ Thomas C. Platt
       Thomas C. Platt, U.S.D.J.

Dated:   Central Islip, New York
        July 7, 2006